## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

JOHN GRAHAM,

           Plaintiff,

 v.

COBB COUNTY, GA,

           Defendant.

**CIVIL ACTION FILE NO.**

1:23-cv-04169-TRJ

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## BRIEF IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff is one of eleven current or former Battalion Chief's ("BCs") employed with the Cobb County fire department who have filed suit against Cobb County for purported unpaid overtime wages.[1] Cobb County paid Plaintiff (along with all other BCs) a generous salary, gave him significant independent management authority, and classified him as FLSA-exempt. In the face of prevailing law, his own clear testimony and the testimony of the *Bentley* BCs to the contrary, Plaintiff

---

[1] The remaining ten BCs filed suit against Cobb County in *Bentley, et al v. Cobb County, GA*; Civil Action No. 1:23-cv-01827-TRJ ("*Bentley*"). The County filed a Brief in Support of Motion for Summary Judgment ("*Bentley Brief*") in *Bentley* on December 16, 2024. *See* [Dkt No. 44-1] in *Bentley*. Because the facts are analogous among Plaintiff and the BCs in *Bentley*, and the job duties for Plaintiff and the *Bentley* BCs are largely the same, Defendant will refer to the *Bentley* brief for citations to the record in support of its arguments herein and the Plaintiff and Bentley BCs will be dealt with as a group. *See* Graham Dep. [Dkt No.44] pp. 83:10-84:24; *Bentley Brief,* footnote 1.

challenges that classification, claiming he is merely a firefighter, should have been non-exempt, and should have been paid overtime. Plaintiff is wrong; no material fact dispute exists, and summary judgment should be granted.

### STATEMENT OF FACTS

## I.     Structure of the Cobb County Fire Department

Cobb County's fire department employs around 810 personnel. Declaration of James Michael Schutz, Jr. ¶8. It is headed by Fire Chief Dr. Michael Cunningham. Schutz Decl. [Dkt No 62] ¶9. Three Deputy Chiefs report to Chief Cunningham: (1) Michael Schutz (Deputy Chief of Response); (2) Carl Crumbley (Deputy Chief of Community Risk Reduction); and (3) Kevin Gross (Deputy Chief of Preparedness). *Id.* Reporting to the Deputy Chiefs are eight District or Division Chiefs, each with responsibility for a particular function within the department (*e.g.* Response, Training, Investigations, EMS, Fire Marshal, Logistics, *etc*.). *Id.* at ¶¶10-11. The next highest rank in the fire department is Battalion Chief – ***only thirteen individuals outrank BCs in the entire Cobb County fire department***.[2] *Id.* at ¶12; Graham Dep. [Dkt No.44]    p. 63:10-21. The BCs are senior managers in the department's Response Division. Schutz Decl. [Dkt No.62] ¶14. Each BC reports to a District Chief, who reports to Deputy Chief Schutz, who reports to the Fire Chief. *Id.* at ¶17.

---

[2] *See Bentley Brief* footnote 3.

The Response Division is organized into five Battalions, each covering a defined area. *Id.* at ¶15. Five to seven Fire Stations exist within each Battalion. *Id.* at ¶20. Each Battalion is organized into three shifts (A, B and C). *Id.* at ¶16. Thus, a BC assignment, for example, would be "Second Battalion, C Shift" to designate his scope of responsibility. *Id.* Except for the Deputy and District Chiefs, employees in the Response Division, including BCs, typically work a 24-hours on, 48-hours off shift schedule. *Id.* at ¶18; Graham Dep. [Dkt No.44] p. 52:3-14. Thus, during non-business hours (8:00 a.m. to 5:00 p.m., Monday through Friday) the BCs are the highest ranking officers on duty in the entire department. Schutz Decl. [Dkt No.62] ¶13; *see also* Graham Dep. [Dkt No.44] p. 201:8-12 (agreeing BCs are highest ranking on-duty person at the fire department when the District Chiefs are not in their normal hours).

BCs manage approximately 35-49 subordinate fire personnel on their shift across the 5-7 stations in their battalion. *Id.* at ¶¶19-20. Each station has a "Station Officer" who is responsible for managing the station. *Id.* at ¶20. The Station Officer can be either a Captain or a Lieutenant. *Id.* at ¶25; *see also* Hancock Dep. [Dkt No. 58] pp. 131:19-21. The Captains report to the BC for their shift, and the Lieutenants report to a Captain on their shift. Schutz Decl. [Dkt No.62] ¶26.[3] While the reporting

---

[3] Captains and Lieutenants (particularly Lieutenants) regularly enter the "hot zone" of fire scenes, serving essentially as "working foremen" with both management *and*

structure is dependent upon the station allotment for each Battalion, the typical arrangement is that there are two Captains and anywhere from five to seven Lieutenants in each Battalion. *Id.* at ¶21. The Lieutenant is the first management rank within the Fire Department, with Captains having additional responsibility. *Id.* at ¶22; Graham Dep. [Dkt No.44] pp. 98:7-99:9 (lieutenant is the first role where they become a station officer and they report directly to captains). Next are the Engineers, who usually drive and operate fire apparatus (*i.e.*, vehicles, water pumps, extinguishment equipment *etc.*). Schutz Decl. [Dkt No.62] ¶27. Below Engineers are the entry-level Firefighters, whose principal duty is to engage in hands-on fire suppression or related responsibilities – fighting fires, pulling hoses, administering fire retardants, administering first aid, and rescuing individuals in distress. *Id.* at ¶28.

As one progresses from Firefighter to Engineer, to Lieutenant, to Captain and ultimately to BC, the roles shift from direct firefighting duties to management. *Id.* at ¶29; *see e.g.* Graham Dep. [Dkt No. 44] p. 194:13-16; Smith Dep. [Dkt No.57] p. 221:14-236:23 and 248:1-24; Lewis Dep. [Dkt No.56] p. 93:2-12; Chastain Dep. [Dkt No.53] p. 160:14-18; Lester Dep. [Dkt No.59] p. 78:15-20. By the time employees reach the BC rank, they are demonstrably managers and do not regularly engage in hands-on firefighting activities. Schutz Decl. [Dkt No. ] ¶ 29.

---

direct firefighting responsibilities in emergency situations. It is for this reason that Cobb County classifies both ranks as non-exempt. [Dkt No. ] ¶¶23-24.

**II.    Plaintiff is a highly trained, experienced, responsible, and professional management personnel with decades of experience.**

Plaintiff is 52 years old and has worked for Cobb County for 20+ years. *See* Schutz Decl. [Dkt No. 62] ¶¶ 30-31; [Dkt. No.62-1] Appendix A; Graham Dep.[Dkt No. 44] p. 16:9-11. Plaintiff started as a basic firefighter and was promoted through the ranks after he demonstrated exceptional ability. *Id.* at ¶32. Cobb County's BCs are sought out as lecturers, evaluators, and subject matter experts by other fire departments and organizations across the country. *See e.g.* Graham Dep. [Dkt No.44] p. 161:16-21 (teaching vertical ventilation because it is an area of expertise); p. 95:2-17 (served as assessor of fire personnel hires at assessment centers for other fire departments).

**III.    The vast majority of Plaintiff's work consists of exempt tasks.**

**A.    BCs have the overall responsibility for managing all aspects of the battalion on their shift.**

The job description for the BC position outlines the management functions performed by Plaintiff. *See* [Dkt 52-1], Exhibits 22, 23; and [Dkt 46-1], Exhibit 37; *cf* Schutz Decl. [Dkt No. 62] ¶33-34 (job descriptions).[4] With a few non-material exceptions, Plaintiff (as did the *Bentley* BCs) testified the job descriptions accurately

---

[4] There are three versions of the job description ([Dkt 52-1], Exhibits 22, 23; and [Dkt 46-1], Exhibit 37). The differences between the two are not material.

reflect his job duties.[5] Graham Dep. [Dkt No.44]  pp. 211:3-223:17. Moreover, the testimony of Plaintiff and the BCs in *Bentley* confirm the BCs' primary job duty was to manage their battalion.[6] Graham Dep. [Dkt No.44] pp. 174:22-175:7 (agreeing BCs have management responsibilities); 176:2-16 (agreeing BC ensures personnel are following procedures and policies of the fire department and are adequately trained); 198:3-23 (spends majority of his time as a BC training, staffing, managing equipment, and ensuring preparedness of the battalion); 199:2-19 (BCs are responsible for ensuring battalion is prepared and lieutenants are performing their administrative duties); 201:13-17 (BCs use their brains to manage people and their battalion); 211:3-11 (agreeing that BCs perform highly management and administrative duties in organizing, directing, and controlling the activities of the field battalion); 212:6-15 (agreeing BCs supervise and manage personnel).

### B.    BCs are responsible for managing, implementing, and conducting training, or delegate that duty to subordinates.

Plaintiff and the *Bentley* BCs confirmed that they were either directly or indirectly responsible for ensuring their battalion was well trained – another management task.[7] Graham Dep. [Dkt No.44] p. 73:22-25 (BCs encourage station officers reporting to them to train lower-ranking personnel); 75:2-5 (BCs make sure

---

[5] *See Bentely Brief* footnote 6.
[6] *See Bentely Brief* footnote 7.
[7] *See Bentley Brief,* footnote 8.

people within their battalion receive the training they need); 167:24-68:4 (as the most senior officer for the battalion, the BC is responsible for ensuring the appropriate training gets pushed down to the personnel within their battalion).

### C.     BCs are responsible for managing the staffing of their shift, in terms of both people and equipment.

BCs manage the staffing process on their shift by: (1) ensuring enough personnel are on shift; (2) ensuring personnel are assigned to the right apparatus, based upon their skills and training; (3) managing employee leave requests and sick days; (4) backfilling absences; (5) deciding which equipment should be pulled out of service if there is insufficient personnel to staff them; and (6) moving/allocating equipment around the battalion/county to ensure optimal coverage of people and apparatuses.[8] Graham Dep. [Dkt No.44] p. 35:9-21 (BCs are tested on their ability to administer scheduling and allocating fire department resources); 75:6-8 (BCs are responsible for making sure they have the right people on the right equipment); 89:13-15 (BCs are responsible for ensuring battalion shift is fully staffed); 198:7-17 (BCs are responsible for staffing); 221:15-18 (agreeing BCs are responsible for scheduling and allocation of personnel and resources to increase efficiency).

---

[8] *See Bentley Brief,* footnote 9.

**D.   BCs are responsible for handling employee disciplinary matters and are involved in termination decisions.**

BCs are also involved in the employee disciplinary process. Schutz Decl. [Dkt No. 62] ¶¶35-42. Plaintiff and the *Bentley* BCs testified that they preferred to actively manage their battalions so that potential disciplinary issues are avoided altogether.[9]   Graham Dep. [Dkt No.44]  p. 202:6-9 ( one of the goals of the BC is to manage the battalion in such a way that the disciplinary issues do not rise to the level warranting suspension). Moreover, BCs have the discretion to address disciplinary infractions at the BC level, rather than resorting to Cobb County's more formal processes.[10]   Graham Dep. [Dkt No.44]  p. 202: 17-23 (has been able to handle most emerging disciplinary problems as a BC at the battalion level before it escalates up the chain); 203:1-23 (BCs can issue verbal warnings without more senior approval). Although BCs do not possess the independent authority to suspend or terminate, they are consulted, make recommendations, and their input is given particular weight.[11] BCs investigate potential infractions and recommend discipline to the command staff. Crumbley Dep. [Dkt No.47] pp. 49:17-50:13; Graham Dep. [Dkt No.44]  pp. 202:25-203:9; (BCs can issue verbal warnings without more senior approval); 204:15-206:6 (explaining the number of recommended written counseling

---

[9] See *Bentley Brief,* footnote 10.
[10] *See Bentley Brief*, footnote 11.
[11] *See Bentley Brief*, footnote 12.

administered that were accepted and/or rejected by District Chiefs). As explained by Cobb County's recently-retired Fire Chief William Johnson (who was Plaintiff's Fire Chief when he was actively working), *any* discipline in a battalion involves the BC. Johnson Dep. [Dkt No.49] p. 71:1-5. Chief Johnson almost always considered a BC's recommendation in termination decisions. Johnson Dep. [Dkt No.49] p. 69:13-21.

### E.    BCs evaluate the performance of subordinate personnel.

BCs regularly evaluate employee performance, including by completing annual performance reviews for their direct reports – their Captains, some Lieutenants, and their Chief's Aide. Schutz Decl. [Dkt No. 62] ¶43. They approve performance reviews conducted by Captains/Lieutenants for other employees. *Id.* at ¶44; Graham Dep.[Dkt No.44] p. 100:12-15 (BCs are responsible for reviewing every performance review of the people in their battalion on their shift).[12]

### F.    BCs create or revise departmental policy and serve as subject-matter-experts on various topics.

BCs are senior leaders with decades of experience. *See* Schutz Decl. [Dkt No.62-1], Appendix A, for Graham and the Schutz Decl. [Dkt No. 44-2], Appendix A in *Bentley* for the *Bentley* BCs. As such, they are involved in the development and drafting of fire department polices, standard operating procedures, and best

---

[12] *See Bentley Brief,* footnote 13.

practices.[13] *See* Graham Dep. [Dkt No.44] p. 125:1-3 (served on the Blue Card working group as BC to assist with forming the Cobb County Fire Services Incident Management System Manual).

### G.    BCs are involved in hiring and promotions, including making recommendations that carry particular weight.

Hiring in public fire departments, like Cobb County's, is different than hiring in "civilian" jobs. Schutz Decl. [Dkt No. 62] ¶45. Incoming Firefighters generally must pass a comprehensive background check and pass preliminary objective testing (physical agility and mental aptitude), and then must complete schooling at the Fire Academy before they can enter service. *Id.*; *see also* Graham Dep. [Dkt No.44] p. 32:24-33:2 (stating every position from Captain below requires objective testing). As such, few members of the Fire Department make formal hiring decisions – the testing processes of the Fire Academy and the background checks dictate who ultimately becomes a Firefighter. Schutz Decl. [Dkt No. 62] ¶46.

That does not mean, however, that BCs are uninvolved in hiring. BCs participate in the Fire Academy as instructors and evaluators, and can pass/fail a recruit on their ability to perform basic firefighting tasks while in the Academy. Schutz Decl. [Dkt No. 62] ¶¶47-48. Thus, if a BC serving as a testing evaluator refuses to pass a candidate on a given task, that candidate may not become a

---

[13] *See Bentley Brief,* footnote 14.

Firefighter. *Id.* at ¶49. BCs may also be consulted on employee re-hires; *i.e.*, when a firefighter leaves the department and seeks to return – and their recommendations in that regard are considered by more senior staff.  Schutz Decl. [Dkt No. 62] ¶ 50.

Promotions within the Fire Department are also handled differently. The common progression is Firefighter » Engineer » Lieutenant » Captain » Battalion Chief. Schutz Decl. [Dkt No. 62] ¶51. A Firefighter who wants to progress to Engineer, and then to Lieutenant, must meet tenure requirements and pass a test. *Id.* at ¶¶52-55. The individuals who score the highest on the test are the ones promoted; end of story. *Id* at ¶ 52.[14] Captain and BC promotions are similar, but the process for those ranks also includes an interview with members of the Fire Department's command staff and is not solely test-based. Schutz Decl. [Dkt No. 62] ¶56.  Again, however, BCs provide significant input to the promotional process for Captains and BCs. *Id.* at ¶57. First, BCs prepare members of their battalion seeking promotions for the testing process, which significantly enhances their promotional opportunities. *Id.* at ¶58; Graham Dep. [Dkt No.44] pp. 72:12-73:25.[15] Moreover, BCs make recommendations on BC/Captain promotions to more senior staff and their input is given particular weight. Schutz Decl. [Dkt No. 62] ¶¶59-61.[16]  In fact, a

---

[14] *See Bentley Brief,* footnote 15.
[15] *See Bentley Brief,* footnote 16.
[16] *See Bentley Brief*, footnote 17.

recommendation by a BC – for or against – a promotion often has the most significant impact on the decision. Schutz Decl. [Dkt No. 62] ¶61.

## IV.    Plaintiff remains a manager on emergency scenes and rarely, if ever, engages in hands-on firefighting activities.

Cobb County's Fire Department gets thousands of emergency calls per year through its dispatch/911 service. Schutz Decl. [Dkt No. 62] ¶63. Most of those calls involve non-fire-related incidents, such as EMS/Paramedic calls, traffic accidents, and similar matters. Graham Dep. [Dkt No.44] p. 78:19-22. Those calls are generally handled at the Lieutenant level or below – either an EMS vehicle or a fire engine (with a Lieutenant in charge) respond to the scene. *Id.* at ¶¶64-65. Captains, who are assigned to a larger ladder-truck apparatus, usually respond less frequently than Lieutenants. *Id.* at ¶66; Graham Dep. [Dkt No.44] p. 194:17-195:4 (stating the Captains ride in more expensive pieces of equipment (apparatuses) than Lieutenants). BCs are only dispatched to incidents requiring multiple (at least three) fire apparatuses. *Id.* at ¶67; *See also*, Graham Dep. [Dkt No.44] p. 81:8-13 (BCs are only dispatched if there are at least three apparatuses). This is so that they can dedicate their time to management tasks. Schutz Decl. [Dkt No. 62] ¶68.[17]

---

[17] *See Bentley Brief*, footnote 18.

**A.    BCs most often serve as incident commanders at emergency scenes.**

As noted by the Department of Labor: "directing operations at . . . fire or accident scenes, including deciding whether additional personnel or equipment is needed . . ." are exempt functions. *See Defining & Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales & Computer Employees,* 69 Fed. Reg. 22122, 22130 (Apr. 23, 2004). For the incidents where BCs arrive at a scene, they usually assume "incident command" and do not cease being managers. Schutz Decl. [Dkt No. 62] ¶73. During the relevant timeframe, Cobb County utilized the "Blue Card" system for fire scene management. *Id.* at ¶ 74. Blue Card is a communications and command system/strategy, a key component of which is designating a senior fire officer (often a BC) to assume full command over a scene. *Id.* at ¶75.[18] The person serving as the Incident Commander ("IC") is fully and completely in charge – his/her word is the law – to ensure that there are no conflicting instructions, there is continuity of strategy, and that the available resources are used in the most effective and synchronized way. Schutz Decl. [Dkt No. 62] ¶ 76.[19] Generally, a BC arriving at a scene will assume command as the IC.

---

[18] *See* https://bshifter.com/ (Blue Card website); Schutz Decl. [Dkt No. 62] ¶75.

[19] Cobb County's implementation of Blue Card is memorialized in its comprehensive Incident Management System Manual ("IMS Manual"), finalized in August 2021. Schutz Decl. [Dkt No. 62] ¶¶71-82; *Bentley* Deposition Exhibit 20 [Dkt No. 55-1]. Despite the IMS Manual coming online in 2021, its principles have been in use by Cobb County Fire since 2018. *Id.*

*Id.* at ¶¶84-85; *see* Graham Dep. [Dkt No.44] p. 132:24-133:6. If more than one BC is dispatched (which occurs relatively rarely), then the first arriving BC will be the IC, and the second arriving BC serves in a "Division Supervisor" role (described below). Schutz Decl. [Dkt No. 62]  ¶86; *See also*, Graham Dep. [Dkt No.44] p. 149:24 (agreeing second arriving BC for bigger incidents is the Division Supervisor). As stated in the IMS Manual: "[t]he IC is the resource allocator for the incident and is responsible for managing all assigned resources work cycles on a strategic level." [Dkt 52-1], Exhibit 20, p. 10. It continues: "[a]n IC properly managing the incident's strategy has the **#1 – GREATEST** overall impact on responder safety." *Id.* at page 40 (emphasis in the original). "The IC is the person that has to match (and manage) the work that must take place at the incident scene to the people and equipment that will be doing the work. Matching these two constants (tasks and workers) requires the IC to have a good grasp of the available area personnel, equipment, apparatus, and systems used to activate and manage those resources." *Id.* at 11.

The IC must be free of distractions so that he can focus and appropriately direct frontline personnel. Schutz Decl. [Dkt No. 62] ¶87. The BC's vehicle is a garden-variety pickup truck which does not carry fire retardant, hoses, or similar items (other than small handheld devices), but instead is equipped with a laptop

computer, whiteboard/paper board, and communications devices – it is the BC's mobile office. *Id.* at ¶88; Graham Dep. [Dkt No.44] pp. 138:16-139:15. As such, the recommended station for the IC on scene is in the cab of his vehicle, with the windows up, and directing the scene using the computer, radio, and worksheets. Schutz Decl. [Dkt No. 62] ¶89. As agreed to by Plaintiff, the IC is the "head coach" at the scene. Graham Dep.[Dkt No.44] p. 123:2-4; 142:8-15 (agreeing IC manages the incident strategy).

The IC does not wear "bunker gear" or other PPE and does not go in the IDLH or "hot" zone.[20] Schutz Decl. [Dkt No. 62] ¶90. The IC does not pull hoses, throw ladders, break down doors, or engage in rescue activities. *Id.* at ¶91. Indeed, the need for a senior IC at a fire scene is so important for the overall management of the scene that operationally, Cobb County ***does not want*** its BCs to engage in hands-on firefighting or other emergency response duties. *Id.* at ¶¶80, 94; Graham Dep. [Dkt No.44] p. 141:5-16 (agreeing ICs are outside the IDLH because it is a strategic position that should not be distracted by events occurring in the hazard zone). This is a non-manual and managerial job requiring great intellectual, rather than physical, effort. Schutz Decl. [Dkt No. 62] ¶95; Graham Dep. [Dkt No.44] p. 122:7-12 (Being

---

[20] "Immediate Danger to Life and Health." This is the zone in which full PPE and bunker gear is required. The "warm zone" is an area just outside the IDLH where PPE is usually worn as well. Schutz Decl. [Dkt No. 62] ¶¶77-78; Graham Dep. [Dkt No.44] p. 145:17-23.

the IC takes a lot of intellect); 140:11-141:4 (BCs use their brain to apply all their knowledge, training, and experience when serving as IC). BCs serving as ICs continually exercise independent discretion and judgment over all matters at an emergency scene, including over significant events affecting the lives, health and property of citizens and other personnel. Schutz Decl. [Dkt No. 62] ¶95. Graham Dep. [Dkt No.44] p. 122:2-22 (agreeing the IC is a key player, and it is the IC's job fix something if it is not going right; also agreeing IC is a highly strategic job managing dozens of people and keeping track of what they are doing on the scene); 143:8-11 (being a good IC requires being able to assess a situation and adapt a plan to address it in real time); 144:12-145: (IC's role is to maintain safety and effectiveness).

### B. BCs are managers when acting as Division Supervisors.

As mentioned, on the few occasions where a *second* BC is dispatched, he most often serves as a "Division Supervisor." Schutz Decl. [Dkt No. 62] ¶96; Graham Dep.[Dkt No. 44] p. 149:20-23. The Division Supervisor is subject to the IC but still manages frontline fire personnel. *Id.* at ¶97. Often, the Division Supervisor is at the rear of a structure – outside of the IC's line of sight – and serves as the eyes and ears of the IC on that side of the building. *Id.* at ¶98. The County's strong preference for

Division Commanders is that they, like the IC, stay **outside** the IDLH.[21] *Id*. at ¶ 99; Graham Dep. [Dkt No.44] p. 150:3-13. That way, they remain free to see the "big picture," provide information to the IC, and can direct subordinate firefighters more effectively. *Id.* at ¶100. Because a Division Supervisor is stationed closer to the hazard zone than the IC, however, they generally wear PPE (coat, helmet, *etc.*) and carry a SCBA (air) pack. Schutz Decl. [Dkt No. 62] ¶101. Even so, the Division Supervisor rarely is in the IDLH – while they might take a quick look inside to assess the situation, they are trained to remain outside of the IDLH and to enter it only if necessary. *Id.* at ¶102; Graham Dep.[Dkt No.44] p. 153:4-8 (agreeing that Division Supervisors may go into the hot zone to assess a situation but are trained to remain outside the IDLH and may not go inside the hot zone at all). As Division Supervisor, therefore, BCs are not engaged in frontline firefighting but instead manage others who are involved in those functions. *Id.* at ¶ 103; Graham Dep.[Dkt No.44] p. 152: 21-24 (Division Supervisors serve in a strategic supervisory capacity).

### C. BCs go to only a tiny proportion of calls, and when they do, they are usually the Incident Commander.

The fallacy in Plaintiff's contention that hands-on firefighting is his primary duty is clear once one learns the incident command role they usually play on-scene (as outlined above) and how *infrequently* BCs (in stark contrast to other fire

---

[21] *See Bentley Brief*, footnote 23.

personnel) are exposed to the IDLH/hot zone. BCs are dispatched only to significant scenes involving multiple units. *Id.* at ¶104; *cf* Graham Dep. [Dkt No.44] p. 81:8-13.[22] Cobb County keeps data for all dispatches and calls, which includes duration, arrival times, departure/clear times, and similar data. Here, the fire department calculated (1) the overall percentage of calls to which BCs are dispatched (against the total number of calls on their shift); (2) how often their dispatch was cancelled prior to their arriving; (3) whether they were the first or second arriving BC (and therefore serving in an IC or Division Supervisor role); and (4) the estimated amount of time spent on scene. *See* Schutz Decl. [Dkt No. 62,] ¶¶107-109, [Dkt. No.62-2] Appendix B.

The hard statistics gut Plaintiff's primary duty arguments: (1) Plaintiff was dispatched to less than 1% of calls between 2020 and 2024 (2) a significant number of those calls were cancelled *en route*, further reducing the number of responses; (3) Plaintiff did not spend more than 3% of his work time responding to calls in any given year; (4) Plaintiff did not spend more than 56 total work hours annually on incident scenes; and (5) according to the data, Plaintiff *never* worked as a Division Supervisor. *See* Schutz Decl. [Dkt No. 62] ¶109, [Dkt. No. 62-2] Appendix B.

---

[22] The majority are routine EMS calls, and BCs generally do not respond to those. Schutz Decl. [Dkt No.62] ¶105; Graham Dep. [Dkt No.44] p. 78:19-22. Firefighters, Engineers and Lieutenants handle most calls. *Id.* Captains go less frequently than Lieutenants, and BCs go significantly less frequently than Captains. *Id.* at ¶106.

According to Plaintiff himself, he went into the "hot zone" no more than 5 times in his last year of work. Graham Dep. [Dkt No.44] p. 155:1-4. No material fact dispute exists on this point—either way, his activity in this regard is *de minimis* at best. What is clear from the data is that Plaintiff almost never (if ever) engaged in frontline firefighting activities. *Id.* at ¶110, Appendix B. There is no meaningful way for Plaintiff to dispute this data. BCs (including Plaintiff) rarely serve in a Division Supervisor capacity requiring them to enter the IDLH.[23]

**V.    Plaintiff's primary duty is/was managing their battalion on their shift.**

As outlined in the Schutz Declaration, the primary BC job duty is to manage the affairs of their battalion. Schutz Decl. [Dkt No. 62] ¶¶111-116. They are senior leaders who are evaluated not on how well they manually fight fires, but how well they lead subordinate personnel and manage their team. *Id.* at ¶115. They are involved with staffing, allocation of firefighting equipment and personnel, managing training and personnel budgets, handling personnel issues, managing employee morale, implementing and enforcing departmental and County policies, training, making recommendations regarding hiring and firing, and (although infrequently) serving as ICs. *Id.* at ¶¶111-116; Graham Dep. [Dkt No.44] p. 198:5-23. Even when a BC does not have ultimate authority on an issue (such as employee terminations),

---

[23] *See Bentley Brief,* footnote 27.

his input is given particular weight by more senior staff. Schutz Decl. [Dkt No. 62] ¶113. When BCs respond to fire scenes, they are almost always ICs, do not wear protective gear, and manage and direct operations from a secure location outside of the hazard zone. Graham Dep. [Dkt No.44] 138:21-139:5. Plaintiff did not spend virtually no meaningful time even near a hazard zone because he never (or at best rarely) served as Division Supervisor during the applicable limitations period. Schutz Decl. [Dkt No. 62] ¶ 109, [Dkt No.62-2] Appendix B. Management is his primary duty, not responding. *See generally* Statement of Facts, §III, A-G, above. Multiple current and former Battalion Chiefs agree that Plaintiff's primary duty is management.[24]

The BCs primary duty is management of their battalion (including acting as IC) and ensuring subordinate fire personnel were properly staffed, trained, and equipped.[25] Graham Depp. 198-200. (majority of his time as BC is spent training, staffing, and allocating checking equipment, and ensuring his battalion is optimally functioning). Therefore, no material dispute on this point exists.

---

[24] *See Bentley Brief*, footnote 28.
[25] *See Bentely Brief*, footnote 29.

**VI.    Plaintiff was paid on a salary basis, and usually above the Highly Compensated Employee exemption threshold.**

An exempt employee must be paid on a "salary basis" at an annual rate of at least \$43,888.00.[26] Plaintiff confirmed he was paid on a salary basis because he was paid a fixed salary not tied to the number of hours he worked, and his salary was never docked BC.[27] Graham Dep. [Dkt No.44] p. 42:22-48:1. Plaintiff's salary for the relevant period is shown in the Schutz Declaration [Dkt No 62-3], Appendix C; his salary exceeded the threshold.[28] Further, the FLSA's Highly Compensated Employee ("HCE") exemption (29 C.F.R. §541.601(a)) applies.[29] As shown in the Schutz Declaration [Dkt No. 62-3], Appendix C, Plaintiff's salary exceeded the HCE threshold(s) for the *entirety* of the relevant period(s).

---

[26] 29 C.F.R. §541.600. This is the minimum exempt salary threshold effective July 1, 2024; previously the threshold was \$35,568.  Plaintiff meets it either way.

[27] After he suffered a stroke, Plaintiff worked a 40-hour workweek schedule on light duty between November 28, 2021 and June 26, 2022. During this time, Plaintiff maintained the same salary he had while on regular duty. Despite being paid on a salary basis, Plaintiff clocked in and out at the beginning and end of each shift and took a hour lunch during this light duty period. Schutz Decl. [Dkt No. 62] ¶ 121. Even though he was documenting his time worked, Plaintiff's pay did not vary based upon his hours and he did not fall under the HCE threshold during this timeframe.

[28] The salary ranges reflected in Schutz Decl. [Dkt No. 62-3] Appendix C are the result of Plaintiff receiving one or more pay increases over the course of a calendar year. Graham Dep. [Dkt No.44] pp. 48:2-49:25 (discussing educational achievement enhancements).

[29] The HCE threshold was \$107,432 until July 1, 2024 when it increased to \$132,964.

**VII.    Cobb County's exempt classification of BCs was made in good faith.**

Cobb County had outside human resources professionals evaluate the exempt status of county personnel (including BCs), in 2006, 2017 and 2022. None of those outside experts found any misclassification issues. *See* Deposition of Aleah Hawks, [Dkt No. 45] pp. 22:5-42:13; [Dkt No. 45-1], Exhibits 34, 35 and 36 (surveys).

## ARGUMENT AND CITATION OF AUTHORITY

The "purpose of summary judgment is to . . . assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee's note). If the non-moving party's response to the summary judgment motion consists of no more than conclusory allegations, then the court must enter summary judgment in the moving party's favor. *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir.1989).

**I.    Plaintiff is indisputably an exempt employee.**

Under the FLSA, exempt employees must be paid on a salary basis and satisfy a duties test. *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir. 2004). As outlined above, no dispute exists on the first factor – Plaintiff was indisputably paid on a salary basis. As to the second, Plaintiff meets the duties test for the HCE exemption, the Executive and Administrative exemptions, or a hybrid of the two.

**A.    Plaintiff's primary duty is management of his battalion.**

For any exemption, Plaintiff's "primary duty" must consist of exempt functions. The regulations define the term "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Factors to consider when determining the primary duty of an employee include (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* Generally, an employee's primary duty is the work on which they spend the most time. *See* 29 C.F.R. §541.700(b) (noting that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement" but, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion"). *See also Klim v. DS Services of Am., Inc.*, 225 F. Supp. 3d 1373, 1377-1378 (N.D. Ga. 2015). The primary duty test analyzes "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole" to determine the "principal, main, major or most important duty that the employee performs." *Id.* at

§ 541.700(a). Indeed, other than claiming that his (very limited) activity on emergency scenes constitutes non-exempt work, virtually all of the other job tasks admittedly and indisputably engaged in by Plaintiff are exempt in nature. Plaintiff cannot credibly dispute that. Here, the record demonstrates that exempt work is effectively *all* Plaintiff did, including any work he performed on fire scenes.

Although FRR clarifies the application of the Part 541 exemptions to firefighters, it does not replace the primary duty test. The FRR begins by stating that the Part 541 exemptions "do not apply to . . . fire fighters . . . , regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire . . . or accident victims; . . . or other similar work." 29 C.F.R. §541.3(b)(1). This conclusion reflects an assumption about frontline firefighters' primary duty: "[s]uch employees [*i.e.*, non-exempt emergency responders] do not qualify as exempt executive employees because their primary duty is not management of the enterprise." *Id.* at § 541.3(b)(2) (emphasis added).

In the Preamble to § 541.3, the DOL explained that senior fire officials are exempt if, "in addition to satisfying the other pertinent requirements, . . . [the fire officials'] primary duty is performing managerial tasks." *Defining & Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales & Computer Employees,* 69 Fed. Reg. 22122, 22130 (Apr. 23, 2004). In the emergency response

context, therefore, managerial tasks include:

> Evaluating personnel performance; enforcing and imposing penalties for violations of the rules and regulations; making recommendations as to hiring, promotion, discipline or termination; coordinating and implementing training programs; maintaining company payroll and personnel records; handling community complaints, including determining whether to refer such complaints to internal affairs for further investigation; preparing budgets and controlling expenditures; ensuring operational readiness through supervision and inspection of personnel, equipment and quarters; deciding how and where to allocate personnel; managing the distribution of equipment; maintaining inventory of property and supplies; and directing operations at . . . fire or accident scenes, including deciding whether additional personnel or equipment is needed. *Id.* at 22130.

In implementing the FRR, the DOL provided the foregoing list of emergency response tasks that qualify as "management" (demonstrating that not all fire personnel should be treated as non-exempt), and also cited with approval five cases in which courts have concluded that a fire official's primary duty was management. *Id.* (*citing West v. Anne Arundel Cty.*, 137 F.3d 752 (4th Cir. 1998); *Smith v. City of Jackson*, 954 F.2d 296 (5th Cir. 1992); *Masters v. City of Huntington*, 800 F. Supp. 363 (S.D.W. Va. 1992); *Simmons v. City of Fort Worth*, 805 F. Supp. 419 (N.D. Tex. 1992); *Keller v. City of Columbus*, 778 F. Supp. 1480 (S.D. Ind. 1991); *see also Watkins v. City of Montgomery*, 919 F. Supp. 2d 1254, 1262-63 (M.D. Ala. 2013) (citing *Mullins v. City of New York,* 653 F.3d 104, 110-11 (2nd Cir. 2011) (Section 541.3(b) "does not purport to make all [firefighters] non-exempt; the determining

factor remains their primary duty")). To hold otherwise would cause virtually all fire department employees – even the Fire Chief – to be considered non-exempt, regardless of their actual on-scene role or managerial responsibilities, simply because they might sometimes respond to emergency scenes. *Rooney v. Town of Groton,* 577 F. Supp. 2d 513, 536 (D. Mass. 2008) ("Indeed, at a certain level of abstraction, all [firefighters] could be viewed as first responders. However, such a perspective would undermine the Department of Labor's specifically stated intent not to depart from established case law."); *Mullins,* 653 F.3d at 115 ("the Secretary's interpretation does not . . . depend fundamentally on the location of those [emergency response] activities. That such activities occur 'in the field' is not the dispositive element."); *Watkins v. City of Montgomery*, 919 F. Supp. 2d 1254, 1263 (M.D. Ala. 2013) (section 541.3(b) does not replace the primary duty test and must be applied in conjunction with the Part 541 exemptions).

Following the DOL's lead, Courts hold that on-scene management constitutes non-exempt first responder activity only when the responder is *simultaneously* engaged in frontline firefighting while directing the operation. *Morrison v. Cty. of Fairfax*, 826 F.3d 758, 771-72 (4th Cir. 2016) (distinguishing between "a fire official responsible for high-level direction of operations" with "front-line firefighting" and concluding that fire captains who performed frontline firefighting were non-

exempt); *Mullins*, 653 F.3d at 116 (giving controlling deference to the Secretary's interpretation that "certain managerial tasks such as 'directing operations at crime, fire or accident scenes' when performed by high-level personnel who typically did not engage in any front-line activities would still be considered 'management'"); *Maestas v. Day & Zimmerman, LLC,* 664 F.3d 822, 829 (10th Cir. 2012) ("The distinction appears to hinge on whether the supervisors engage in the same front-line activities as their subordinates on a daily basis.").[30]

In *Emmons*, the most recent case addressing this issue and directly on point, the Fourth Circuit found the City of Chesapeake's Battalion Chiefs to be exempt and affirmed summary judgment, finding that the importance of the BCs' management duties outweighed any non-exempt first responder duties they might occasionally perform. *Emmons*, 982 F.3d at 254-258.[31] The *Emmons* court outlined the managerial tasks performed by Chesapeake's BCs – duties indistinguishable from those performed by Plaintiff and the *Bentley* BCs here – and found their primary duty was management. This included tasks like staffing, supervising personnel,

---

[30] Cobb County's, non-exempt Lieutenants and Captains work in this role, directing frontline firefighters from inside the IDLH and using the same basic firefighting equipment – hoses, ladders, *etc. See* Schutz Decl. [Dkt No. 62]  ¶ 28.

[31] *Emmons* demonstrates that Plaintiff cannot manufacture a fact dispute and avoid summary judgment simply by contending that he subjectively believes any putative first responder activities they perform are their most important job functions. As reflected in *Emmons*, the Court can grant summary judgment where – as here – the evidence demonstrates that management is, in fact, the employees' primary function.

evaluating company officers and firefighters, and ensuring operational readiness for the Battalion. *Id.* In affirming summary judgment, the court held that the staffing, training, and supervisory duties of the Chesapeake BCs had a greater impact on the fire department's operation than tasks performed during the small number of incidents involving response, explaining their managerial duties impacted the "effectiveness of every battalion member, in every single one of the incidents to which they respond, whether the BC is personally present on-scene or not." *Emmons*, 982 F.3d at 254.  That is true here as well.

The *Emmons* court also examined the relative amount of time the BCs spent on exempt versus putative non-exempt tasks, similarly determining that because the spent a majority of their time performing exempt tasks (as with Cobb County's BCs), management was their primary duty. *Emmons*, 982 F.3d at 255. The court noted that the BC "plays a managerial role both while performing in-station duties and while engaged in emergency response" *id,* highlighting the point further – that BCs remain exempt managers when serving as ICs (and even Division Supervisors) at emergency scenes.[32] As here, the *Emmons* BCs were largely free from direct

---

[32] The outcome should be the same even if the Court were to determine that Plaintiff acted as a first responder when serving as Division Supervisor – while that is an important function, serving in that role certainly is not *as important* as the BCs other exempt duties (including acting as IC, which the BCs do more often and is the most important tactical role on-scene), and is performed demonstrably less frequently than their exempt management tasks, as outlined above. Plaintiff's occasional work as a

supervision based upon their shift schedule – because BCs work 24-hour shifts and their supervisors do not, BCs are unsupervised for most of their work time. *Emmons*, 982 F.3d at 255. Finally, Cobb County's BCs are paid in excess of the HCE threshold, far more than a "mere" firefighter, underscoring their exempt status and distinguishing them from those who perform frontline firefighting functions.

This Court should follow *Emmons* and grant summary judgment to Cobb County. The facts are remarkably similar, and the *Emmons* court properly applied the law.[33] No dispute exists that Plaintiff's primary duty was managing his battalion. *See* Schutz Decl. [Dkt No. 62] ¶¶111-116.

---

Division Supervisor cannot, therefore, create a fact dispute preventing summary judgment in this case – that point is immaterial given the context because it is undisputed that acting as a Division Supervisor is ***not*** the BC's primary duty.

[33] The recent case of *Vickery v. City of Roswell*, No. 1:22-cv-02986, 2024 WL 4504999 (N.D. Ga., August 9, 2024) (Calvert, J.) is entirely distinguishable. While that case involved a Roswell, Georgia fire department employee with the *title* of Battalion Chief, the plaintiff's duties in that case were dissimilar to those of Plaintiff and the *Bentley* BCs. First, the parties in *Vickery* agreed Vickery spent *more* than 50% of his work time on incident response, *id.* at p. *3. That is not the case here, according to Plaintiff and the *Bentley* BCs themselves. *See* Statement of Facts, §IV. When he did respond, Vickery would always don bunker gear, *id.* at *2, and "would perform the duties required of any firefighter including advancing the hose line, rescuing victims, and hooking into a fire hydrant", *id*. at *6 – far different from the stationary, strategic, and non-PPE, non-IDLH IC role principally filled by Cobb County's BCs. Further, Vickery never engaged in any disciplinary action without Fire Chief approval, *id.* at *3 (again, not the case here – *see* Statement of Facts, §III.D). Ultimately, Judge Calvert found that Vickery's job duties were more akin to a working foreman who supervised fellow firefighters while simultaneously engaged in manual firefighting tasks – a role similar to Cobb County's non-exempt Captains, *see* Schutz Decl. [Dkt No. 62] ¶¶23-24 – and entirely dissimilar to Cobb County's

**B.    Plaintiff is an exempt Highly Compensated Employee.**

Under the more relaxed HCE exemption, an employee is exempt if: (1) the employee earns annual compensation in excess of the HCE thresholds, (2) the employee's primary duty includes performing office or non-manual work; and (3) the employee customarily and regularly performs at least one of the exempt duties or responsibilities of an exempt executive, administrative or professional employee. 29 C.F.R. §541.601(a-d). "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. §541.601(c). All HCE factors are met here. It is undisputed that Plaintiff was paid above the HCE threshold for all potential limitations periods. *See* Schutz Decl. [Dkt No. 62-3], Appendix C. As demonstrated above, BC's primary duty is non-manual, office/station-based, managerial work. Finally, Plaintiff admitted (repeatedly) that he was regularly engaged in exempt tasks such as managing, leading, training, staffing, personnel/apparatus allocation, incident command, handling employee issues/discipline and similar functions –

---

Battalion Chiefs. Judge Calvert distinguished *Emmons*, finding that Vickery's duties did not include the exempt management functions performed by the *Emmons* BCs – the same exempt duties performed by BCs for Cobb County. *Vickery*, 2024 WL 4504999 at *7. In that regard, Vickery was more like the non-exempt personnel in *Morrison v. Cty. of Fairfax*, 826 F.3d 758, 771-72 (4th Cir. 2016). Further, Vickery did not qualify for the more lenient HCE exemption, as does the Plaintiff in this case. As such, *Vickery* is of no help to Plaintiff under our undisputed case facts.

certainly more than "one" exempt duty.  No fact dispute exists, and Cobb County is entitled to summary judgment under the HCE exemption.

### C.   Plaintiff is alternatively exempt under the Executive exemption, the Administrative Exemption, or a hybrid of the two.

Plaintiff, is also exempt under the executive exemption or a hybrid executive/administrative exemption. An employee can be classified as an exempt executive if they are paid a salary basis, have a primary duty of management, regularly supervise two or more employees, and have the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. *See* 29 CFR § 541.100(a).

No dispute exists as to the first three elements of the exemption (salary basis, management, and supervision of two or more employees) – those are clearly and indisputably satisfied. As to the fourth element, while BCs do not have independent authority to hire and fire, their input and recommendations as to hiring, firing, advancement, promotion and status changes are given particular weight. *See* Statement of Facts, Section III.G, above, and accompanying citations. No meaningful dispute exists on that point.  Further, even if one concluded Plaintiff is not an exempt executive, he is exempt under the FLSA's administrative exemption, or through a hybrid of the executive/administrative exemptions. *See* 29 C.F.R. §

541.200 (elements of the administrative exemption) and 29 C.F.R. § 541.708 ("an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption."); *Kuntsmann v. Aaron Rents, Inc.*, 903 F. Supp. 2d 1258 (N.D. Ala. 2012)(the combination exemption "provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test"). *Id*. at 1266. As outlined above, BCs are paid on a salary basis. They supervise two or more employees. Their primary duty consists of office and non-manual work directly related to the management and general business operations of the Cobb County fire department – they manage an entire battalion from an office, and when they respond, they serve as ICs and do not enter the IDLH. *See* 29 C.F.R. § 541.201 (work directly related to management or general business operations includes "personnel management . . . and similar activities."). Their primary duty certainly involves the exercise independent discretion and judgment over matters of significance – for example, acting as IC at a fire scene is nothing but an intense exercise of such judgment.[34] Graham Dep. [Dkt No.44] p. 122:7-22 (agreeing the IC is a highly strategic job requiring the use of high intellect to manage numerous or dozens of people at a scene); 134:15-135:24 (agreeing IC is responsible for strategically allocating resources for the incident, managing all assigned

---

[34] *See Bentley Brief*, footnote 41.

resources, and matching and managing the work at the incident scene to the people and equipment doing the work). Their high salaries are similarly reflective of the judgment they exercise and the significance of the BC role within the fire department. For those reasons, summary judgment is warranted under the executive/administrative exemptions.

## II. Cobb County is entitled to summary judgment based upon lack of willfulness related to the statute of limitations and liquidated damages.

To establish willfulness for limitations purposes, Plaintiff must show that Cobb County "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L.Ed.2d 115 (1988). Even if an employer acts unreasonably but not recklessly in determining its legal obligations under the FLSA, its actions are not willful and the two-year statute of limitations applies. *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1324 (11th Cir. 2007); *Lockaby v. Top Source Oil Analysis, Inc.,* 998 F. Supp. 1469, 1471 (N.D.Ga.1998) (citing *McLaughlin,* 486 U.S. at 135 n. 13, 108 S. Ct. 1677). Neither negligence, nor even unreasonable conduct, is sufficient to prove willfulness. *Allen*, 495 F.3d 1306, 1324 (11th Cir. 2007). It is Plaintiff's burden to prove willfulness. *Ojeda-Sanchez v. Bland Farms, LLC*, 499 Fed. Appx. 897, 903 (11th Cir. 2012). Plaintiff has not met that burden here – especially in light of Cobb County's using third-parties to assess the exempt status

of its employees and the existence cases like *Emmons* and the others cited above –

upon which the County can reasonably rely. *See* Deposition of Aleah Hawks, [Dkt

No. 45] pp. 22:5-42:13; [Dkt No. 45-1], Exhibits 34, 35 and 36. For those reasons,

summary judgment is warranted as to any claims that predate the FLSA's ordinary

two-year limitations period (if any such claims can be proven at all). Further, if the

employer shows an act constituting a violation was made in good faith and it had

reasonable grounds for believing it lawful, summary judgment is proper as to

liquidated damages. *See* 29 U.S.C. §260; *Gelber v. Akal Sec., Inc.*, 14 F.4th 1279,

1288 (11th Cir. 2021). For the reasons described above, Plaintiff is not entitled to

liquidated damages because of (1) the existence cases like *Emmons*, upon which

Cobb County could reasonably rely; and (2) Cobb County actively sought outside

advice from human resources consultants as to the exempt status of its employees

(including BCs) and were assured that its classification was correct. *See Id.* No

dispute exists as to Defendant's good faith, and summary judgment should be

entered on the issue of liquidated damages.

## CONCLUSION

Any attempt by Plaintiff to contend BCs are not managers, but are primarily

first responders, should be dead on arrival, in light of Plaintiff and the *Bentley* BC's

own unequivocal testimony and cases like *Emmons*. The Court should grant

summary judgment for Cobb County on all of Plaintiff' claims.

Respectfully submitted this 30th day of April, 2025.

**TUCKER ELLIS LLP**

*/s/ Matthew A. Boyd*

Matthew A. Boyd
Georgia Bar No. 027645
Matthew.Boyd@tuckerellis.com
Breshauna C. Perkins
Georgia Bar No. 545430
Breshauna.Perkins@tuckerellis.com
3343 Peachtree Rd, N.E. - Suite 145-1574
Atlanta, Georgia 30326
Telephone:  (404) 678-6365
Facsimile:   (404) 678-6380

**COBB COUNTY ATTORNEY'S OFFICE**

Mark A. Adelman
Senior Associate County Attorney
State Bar No. 004788
mark.adelman@cobbcounty.org
Lauren S. Bruce
Assistant County Attorney
State Bar. No. 796642
lauren.bruce@cobbcounty.org
H. William Rowling, Jr.
County Attorney
State Bar. No. 617225
h.william.rowling@cobbcounty.org
100 Cherokee Street, Suite 350
Marietta, Georgia 30090

*Counsel for Defendant Cobb County, Georgia*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JOHN GRAHAM,

          Plaintiff,

  v.

COBB COUNTY, GA,

          Defendant.

**CIVIL ACTION FILE NO.**

1:23-cv-04169-TRJ

## <u>CERTIFICATE OF SERVICE</u>

This is to hereby certify that I have this day electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

Thomas J. Mew, IV
tmew@bbwmlaw.com
Camille J. Mashman
cmashman@bbwmlaw.com
**BUCKLEY BALA WILSON MEW LLP**
600 Peachtree Street NE, Suite 3900
Atlanta, Georgia 30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101
*Attorneys for Plaintiff*

This 30th day of April, 2025.

/s/ *Matthew A. Boyd*
_____
Matthew A. Boyd